IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WILLIAM RIVERA-MOLINA ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> CASA LA ROCA, LLC ET AL., <br> Defendants. | CIV. NO. 21-1004 (SCC) |

**OPINION AND ORDER**

Defendants Casa La Roca, LLC, Charles Vogel, and Juanita Vogel (collectively, "Casa La Roca") move for summary judgment on Plaintiffs William Rivera-Molina, International Business Solutions, LLC, Ebano 155, Inc., and DC Project Management Corp.'s (collectively, "Rivera-Molina") breach-of-contract claim. Docket No. 286. For the reasons below, we deny its motion.

I.     **ANTI-FERRET RULE**

Before we reach the merits, we first address a procedural issue. Casa La Roca asks the Court to deem its undisputed material facts admitted because Rivera-Molina failed to comply with Local Rule 56. Docket No. 312, pg. 2. Local Rule 56 is our district's anti-ferret rule. It requires a

party that moves for summary judgment to submit a "separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact." *Rodríguez-Severino v. UTC Aero. Sys.*, 52 F.4th 448, 457 (1st Cir. 2022) (quoting D.P.R. Civ. R. 56(b)). The opposing party, in turn, must submit "a separate, short, and concise statement of material facts" that "admit[s], den[ies] or qualif[ies] the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." *Id.* at 457–58 (quoting D.P.R. Civ. R. 56(c)). When the opposing party fails to do so, the court may deem the movant's facts admitted. *Id.* at 458.

Rivera-Molina acknowledges that he did not fully comply with Local Rule 56. *See* Docket No. 319, pg. 3. But he cured his noncompliance in his sur-reply, *see* Docket No. 319, and in conducting the analysis below, we were not forced to ferret through the record. Thus, we decline to deem all of Casa La Roca's facts admitted.

## II.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)). The movant must first "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it might affect the outcome of the lawsuit. *Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc.*, 999 F.3d 37, 50 (1st Cir. 2021). And there is a genuine dispute over it when "the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Id.* (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). After the movant has met its initial burden, the burden shifts to the nonmovant to "produc[e] specific facts sufficient to deflect the swing of the summary judgment scythe." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021). The nonmovant, in other words, must

show that a "trialworthy issue exists." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). But where the nonmovant bears the burden of proof on an issue, the "movant need [only] aver 'an absence of evidence to support the nonmoving party's case.'" *Mottolo v. Fireman's Fund Ins. Co.*, 43 F.3d 723, 725 (1st Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 325).

We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor. *Alston v. Town of Brookline*, 997 F.3d 23, 35 (1st Cir. 2021). In the end, summary judgment is appropriate only when the record demonstrates that "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(a)).

### III.   CASA LA ROCA'S MOTION FOR SUMMARY JUDGMENT

Rivera-Molina brought this breach-of-contract action against Casa La Roca because it allegedly breached their Termination Agreement. Docket No. 9. Casa La Roca counterclaimed, alleging that Rivera-Molina is the one who breached that Agreement. Docket No. 14. Casa La Roca moves

for summary judgment on Rivera-Molina's breach-of-contract claim but not its own.

For several years, Rivera-Molina rented out Casa La Roca's three properties in Puerto Rico. Docket No. 287-1, pg. 1 (Termination Agreement). They split the profits 50/50. *Id.* The parties entered into a Termination Agreement to wrap up their business relationship. *Id.* They agreed that the "Termination Date" would be December 31, 2020, subject to an extension under the force majeure clause. *Id.* at 2, 6–7. Rivera-Molina's breach-of-contract claim hinges on how we construe two clauses in the Termination Agreement. The first clause, the force majeure clause, reads as follows:

> No Party shall be held liable or responsible to the other Party, nor be deemed to be in breach of this Agreement, for failure or delay in fulfilling or performing any provisions of this Agreement (other than payment obligations) when such failure or delay is caused by or results from any cause whatsoever outside the reasonable control of the Party. However, if any force majeure event is of such magnitude (such as a hurricane) that it interrupts conducting the operation, maintenance and short rental

> business by preventing rentals for more than
> ten (10) continuous days, then the Termination
> Date will be extended so that [Rivera-Molina]
> will have the benefit of the full 20 months
> awarded in this contract, not to exceed ninety
> (90) days no matter what the circumstances.

*Id.* at 6–7. The second clause, the option clause, states:

> [Casa La Roca] agrees to grant [Rivera-Molina]
> . . . the exclusive option right to buy and sell La
> Roca II and La Roca III until the Termination
> Date, with a listing price of $2M per property
> and a sales commission of five percent (5%) for
> [Rivera-Molina]. In case [Casa La Roca] decides
> to sell La Roca I, the option to buy and sell
> granted to [Rivera-Molina] will extend to La
> Roca I, as well (again, until the Termination
> Date). [Casa La Roca] shall not be asked or
> expected to pay any additional commission(s)
> to other brokers and if other brokers are
> involved, it will be up to [Rivera-Molina] to
> negotiate a share of [his] [5%] commission. This
> represents a potential benefit of $200,000, and
> this right expires after the foregoing date.

*Id.* at 4–5.

As an overview, Rivera-Molina contends that Casa La
Roca breached the Termination Agreement by forcibly

removing him from the properties before the Termination Date, declining to extend the Agreement an additional 90 days when the COVID-19 pandemic interfered with his short-term rental business, and refusing to sell him two of the La Roca properties after the Termination Date. Casa La Roca responds that the forcible removal issue is moot, COVID-19 is not an event of sufficient magnitude to trigger an extension of the Termination Date, and that his purchase option expired when he failed to close on the properties before the Termination Date.

### A. Contract Interpretation Under Puerto Rico Law

The parties agree that Puerto Rico law governs our interpretation of the Termination Agreement. Docket No. 286, pgs. 7–8; *see* Docket No. 299, pgs. 40–43. To prevail on his breach-of-contract claim, Rivera-Molina must show that Casa La Roca breached the Agreement's terms and that the breach harmed him. *See Almeida-León v. WM Cap. Mgmt.*, 993 F.3d 1, 13 (1st Cir. 2021) (citing *Mattei Nazario v. Vélez & Asociados*, 145 D.P.R. 508, 521 (1998)). Casa La Roca says that it is entitled to summary judgment because it did not breach the Agreement.

Under the Puerto Rico Civil Code, "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. LAWS ANN. tit. 31, § 3471.[1] The parties' intent is discerned from "their acts, contemporaneous and subsequent to the contract." *Id.* § 3472. Construing these provisions and Puerto Rico's former parol evidence rule,[2] the First Circuit has

---

1. Puerto Rico's new civil code took effect in 2020. Because the parties signed the Termination Agreement before the new civil code took effect and rely on the old civil code provisions in their briefing, we use the old civil code provisions here. In any event, we are not aware of any caselaw construing the new provisions differently than the old ones that we use.

2. That Puerto Rico's parol evidence rule has been repealed does not impact the First Circuit caselaw that we cite in our analysis. For this caselaw "d[oes] not rely exclusively on the parol evidence rule." *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 448 n.9 (1st Cir. 2010). Instead, these cases "make clear that [the Puerto Rico Civil Code provisions] preclude[] consideration of 'extrinsic evidence to vary the express, clear, and unambiguous terms of a contract.'" *Id.* (quoting *Borschow Hosp. & Med. Supplies, Inc. v. César Castillo Inc.*, 96 F.3d 10, 15 (1st Cir. 1996)); *see also Vulcan Tools v. Makita USA*, 23 F.3d 564, 567 (1st Cir. 1994) (stating that the principles of Puerto Rico's parol evidence rule are embedded in its civil code); *P.R. Tel. Co. v. Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (explaining, without relying on Puerto Rico's parol evidence rule,

said that "courts may not 'consider[ ] . . . extrinsic evidence to vary the express, clear, and unambiguous terms of a contract.'" *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 447 (1st Cir. 2010) (quoting *Borschow Hosp. & Med. Supplies, Inc. v. César Castillo Inc*., 96 F.3d 10, 15 (1st Cir. 1996)); *see also P.R. Tel. Co. v. Advanced Cellular Sys., Inc*., 483 F.3d 7, 12 (1st Cir. 2007) (stating that no extrinsic evidence of the parties' intent is allowed "if the terms of an agreement are clear"). The terms of a contract are clear when they are "sufficiently lucid to be understood to have one particular meaning, without room for doubt." *Vulcan Tools v. Makita USA*, 23 F.3d 564, 567 (1st Cir. 1994) (quoting *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith*, 839 F. Supp. 98, 104 (D.P.R. 1993)). Thus, in interpreting the Termination Agreement, we begin with its terms. For unless those are unclear, we cannot consider any extrinsic evidence of the parties' intent. *Borschow Hosp. & Med. Supplies*, 96 F.3d at 16 ("Yet to consider extrinsic evidence at all, the court must

---

that as a consequence of Puerto Rico's Civil Code provisions, "a court may not consider extrinsic evidence at all, if it finds that the terms of an agreement are clear").

first find the relevant terms of the agreement unclear. That requirement not being met, the district court correctly went no further." (quoting *Exec. Leasing Corp. v. Banco Popular de P.R.*, 48 F.3d 66, 69 (1st Cir. 1995))).

### B. Analysis

#### i. *Forcible Dispossession of the La Roca Properties*

In Rivera-Molina's amended complaint, he alleges that Casa La Roca breached the Termination Agreement by forcibly dispossessing him of the La Roca properties before the Termination Date. Docket No. 9, pgs. 9–13, 17. Because the Court granted him a possessory injunction, restoring his possession of those properties, Casa La Roca contends that this breach-of-contract claim is now moot. Docket No. 312. To be sure, we granted him the possessory injunction that he asked for in his amended complaint. Docket No. 9, pgs. 13–14; Docket No. 35. But he *also* brought a breach-of-contract claim—seeking damages—because Casa La Roca had dispossessed him of those properties before the Termination Date. Docket No. 9, pgs. 16–17. His breach-of-contract claim for damages has not been mooted by our granting him a

possessory injunction. *See Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 49 (1st Cir. 2006) ("A finding of mootness with respect to a prayer for injunctive relief does not automatically render a companion claim for monetary damages moot."); *see also Town of Portsmouth v. Lewis*, 813 F.3d 54, 60 (1st Cir. 2016) ("It is settled law that a claim for monetary relief . . . may survive events that moot injunctive or declaratory relief."). Because Rivera-Molina has not abandoned his breach-of-contract claim for damages based on Casa La Roca forcefully dispossessing him of the La Roca properties, *see* Docket No. 299, pgs. 5–6, and that claim is not moot, Casa La Roca has failed to show that it is entitled to judgment as a matter of law on that claim. We therefore deny its motion for summary judgment as to Rivera-Molina's breach-of-contract claim stemming from it forcefully dispossessing him of the La Roca properties before the Termination Date.

      *ii.    Force Majeure*

The parties disagree first about the type of event that constitutes a force majeure. Casa La Roca contends that the event must be of similar magnitude to a hurricane and

physically damage the properties, preventing them from being rented. Docket No. 286, pg. 19. Rivera-Molina argues that the triggering event need only be out of his reasonable control. Docket No. 299, pgs. 9–10.

The force majeure clause states that no party shall be deemed to have breached the Termination Agreement if it fails to comply with one of its obligations "when such failure . . . is caused by or results from any cause whatsoever outside the reasonable control of the [p]arty." Docket No. 287-1, pg. 6. It continues, "However, if any force majeure event is of such magnitude (such as a hurricane) that it interrupts conducting the operation, maintenance and short rental business by preventing rentals for more than ten (10) continuous days, then the Termination Date will be extended." *Id.*

Under Casa La Roca's reading, the first sentence and second sentence exist independently: In the first sentence, the parties agree to excuse a breach of the Termination Agreement when that breach is caused by something out of the breaching party's reasonable control, and, in the second sentence, the parties agree that if a force majeure of similar

magnitude to a hurricane prevents rentals for more than 10 continuous days, then the Termination Date will be extended. Casa La Roca adds that the parties intended that the event would be one that physically damaged the properties, preventing them from being rented. Under Rivera-Molina's reading, the first sentence defines force majeure and that definition carries over to the second sentence: In the first sentence, a force majeure is defined as an event out of the breaching party's reasonable control, and, in the second sentence, if an event out of that party's reasonable control prevents rentals for more than 10 continuous days, the Termination Date is extended.

Putting aside the parties' intent, Casa La Roca argues that, based on the text of the Termination Agreement, the force majeure must be of similar magnitude to a hurricane. Docket No. 286, pgs. 19–20; Docket No. 312, pgs. 5–6. But because "such as a hurricane" is enclosed in parenthesis, it is grammatically set off from the surrounding text. THE CHICAGO MANUAL OF STYLE ¶ 6.95 (17th ed. 2017). So "such as a hurricane" does not define "of such magnitude." Instead, a

hurricane is an example of a force majeure that might trigger an extension. Setting aside the parenthetical, "of such magnitude" is defined by what comes next in the sentence: "that it interrupts conducting the . . . short rental business by preventing rentals for more than ten (10) continuous days." Putting it all together, under the plain text of the Termination Agreement, to trigger an extension of the Termination Date, there must be a (1) force majeure that (2) interrupts conducting the short-term rental business by preventing rentals for more than 10 continuous days. Because the text is clear on this point, we do not look at the parties' intent. *See P.R. Tel. Co.*, 483 F.3d at 12.

As to Rivera-Molina's argument that the first sentence—which excuses a breach (except for nonpayment) caused by something out of the breaching party's reasonable control—supplies the definition of force majeure,[3] we see no

---

3. Although Casa La Roca disputes the type of force majeure event that can trigger an extension of the Termination Date (*i.e.*, one that physically damages the properties versus one that otherwise affects the short-term rental business), it agrees that under the Termination Agreement the event must be "outside of the control of the parties." Docket No. 312, pg. 6.

meaningful difference between whether a force majeure is defined as an event out of the breaching party's reasonable control or, as it is in the Puerto Rico Civil Code, "an unforeseeable event that affects a party's contractual obligations." P.R. Laws Ann. tit. 31, § 3022. For both definitions lead to the same analysis under Puerto Rico law.

The Puerto Rico Supreme Court has made clear that foreseeability and the extent to which an event is out of the breaching party's control are baked into the definition of a force majeure. *Rivera v. Caribbean Home Constr. Corp.*, 100 D.P.R. 106, 110 (P.R. 1971) (English language translation available on Lexis) (stating that a force majeure exempts liability "by reason that it cannot be foreseen, or which having been foreseen, cannot be prevented"). In deciding whether an event excuses the failure to perform, and thus constitutes a force majeure, courts consider "the other attendant circumstances," including the frequency and probability of the event and whether the party that failed to perform could have prevented the event's effects or underwent reasonable efforts to mitigate the event's effects. *Id.* at 118–19. We see

very little daylight, if any, between how Rivera-Molina says that the parties defined force majeure and what constitutes a force majeure under Puerto Rico law. The underlying concept for both is whether the event is "not chargeable to the [breaching party]" and "prevents the performance of the obligation." *Id.* at 110. And we would weigh the same factors, regardless of whether we used the first sentence in the force majeure clause or the definition of a force majeure under Puerto Rico law to anchor our analysis.

Casa La Roca concedes that COVID-19 was out of Rivera-Molina's control. Docket No. 286, pg. 4. It also recognizes that a force majeure under Puerto Rico law can include man-made phenomena, such as war. *Id.* at 16. Thus, regardless of COVID-19's origins, it is a force majeure under Puerto Rico law: For it cannot seriously be disputed that COVID-19 was out of Rivera-Molina's control, unforeseeable, and that there is nothing he could have done to prevent it.[4]

---

4. We decline Casa La Roca's invitation to construe what constitutes a force majeure against Rivera-Molina as the drafter. For that rule only applies if the language is ambiguous, P.R. LAWS ANN. tit. 31, § 3478, and here it is not ambiguous.

Now to whether COVID-19 interrupted conducting the short-term rental business by preventing rentals for more than 10 continuous days. Rivera-Molina's breach-of-contract claim as to the force majeure clause is limited to the time between March 15, 2020, and May 5, 2020. Docket No. 287, pg. 4 (¶ 15); Docket No. 319, pg. 4 (¶ 15). During that time, according to Rivera-Molina's internal records, the properties sat vacant for 51, 32, and 40 days, respectively. Docket No. 286, pgs. 10–11; Docket No. 299, pgs. 15–16. Bookings scheduled for March 20th through 30th and April 8th through 12th were cancelled at La Roca I. Docket No. 287, pg. 8 (¶ 48); Docket No. 319, pg. 5 (¶ 48). At La Roca II, bookings scheduled for March 20th through 30th, April 9th through 12th, and April 18th through 24th were cancelled. Docket No. 287, pg. 8 (¶ 49); Docket No. 319, pg. 4 (¶ 49). And at La Roca III, bookings scheduled for March 20th through 23rd, March 27th through 29th, and April 3rd through 11th were cancelled. Docket No. 287, pg. 8 (¶ 50); Docket No. 319, pg. 4 (¶ 50). Emails from the people who had booked the properties show that many of these cancellations were because of COVID-19.

*See* Docket No. 287, pg. 8 (¶ 51); Docket No. 319, pg. 5 (¶ 51).

Airports were not shut down during this time. Docket
No. 287, pg. 6 (¶ 37); Docket No. 319, pg. 5 (¶ 37). And the
Puerto Rico government did not prohibit short-term rentals.
Docket No. 287, pg. 7 (¶ 38); Docket No. 319, pg. 5 (¶ 38).
Rivera-Molina kept advertising the properties, and the
properties were habitable. Docket No. 287, pg. 7 (¶¶ 43–44);
Docket No. 319, pg. 5 (¶¶ 43–44). But on March 12, 2020, the
governor of Puerto Rico declared a state of emergency based
on COVID-19. Docket No. 300-5. To control the spread of
COVID-19, on March 15th, the governor imposed a curfew:
She ordered everyone to stay in their homes and allowed
travel between 5 a.m. and 9 p.m. to seek medical care, go to
work, get necessities, and aid other people. Docket No. 300-6.
On March 31st, she converted the curfew into a lockdown,
which stayed in place through May 5th. Docket Nos. 300-7,
300-8, 300-9, 300-10. Moreover, although Rivera-Molina says
that COVID-19 decreased rental revenue during the relevant
time, Docket No. 300-4, pg. 3, Casa La Roca presents graphs
showing that COVID-19 increased rental revenue, arguing

that COVID-19 helped the rental industry because people preferred to rent homes rather than stay in hotels. Docket No. 286, pgs. 21–22.

Based on the evidence the parties present and the arguments they make, they appear to agree that cancellations and vacancies—not bookings—are relevant to whether COVID-19 prevented rentals for more than 10 continuous days. Casa La Roca argues that COVID-19 needs to have prevented the properties from being rented in the sense that people were *unable* to rent them because of COVID-19, as opposed to merely unwilling to rent them. Docket No. 312, pg. 6. Rivera-Molina counters that "prevent" means to hinder, delay, or hold back. Docket No. 318, pg. 9. So, under his view, that COVID-19 hindered or impeded his ability to rent out the properties for more than 10 continuous days is sufficient to trigger an extension of the Termination Date.

Preventing rentals, as it is used in the force majeure clause, is ambiguous. It could reasonably mean that COVID-19 must have hindered or impeded rentals for more than 10 continuous days to trigger an extension of the Termination

Date. *Prevent*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To stop from happening; to hinder or impede."). It could also reasonably mean that people must have been unable to stay at the properties because of COVID-19. *See id.* The parties have presented conflicting evidence about their intent on this point. *See, e.g.,* Docket No. 300-13, pg. 3 (the parties intended the extension to apply when any event interrupted or suspended operations such that the properties were not able to be rented); Docket No. 287-26 (Rivera-Molina added the force majeure clause to protect him against a business interruption); Docket No. 287-1, pg. 9 (the parties wanted the clause because it took them 90 days to make the properties functional again after a hurricane). Thus, the jury will need to decide what their intent was and then weigh the evidence about rental revenue and historic trends, curfews, lockdowns, vacancies, and cancellations to determine if COVID-19 hindered or impeded rentals for more than 10 continuous days or blocked rentals for more than 10 continuous days, depending on their finding as to the parties' intent. Viewing the facts in the light most favorable to Rivera-Molina and

drawing all reasonable inferences in his favor, as we must, there is a triable issue as to whether COVID-19 prevented rentals for more than 10 continuous days within the meaning of the force majeure clause. We therefore deny summary judgment to Casa La Roca as to Rivera-Molina's breach-of-contract claim stemming from its refusal to extend the Termination Date.

One final point. Rivera-Molina argues that he is entitled to a 90-day extension of the Termination Date. Docket No. 299, pgs. 4, 8, 29. But as Casa La Roca correctly notes, 90 days is the maximum extension. Docket No. 312, pg. 9. Because he limits the force majeure issue to the time between March 15th and May 5th, if he is entitled to an extension, it cannot be longer than that. *See* Docket No. 287-1, pgs. 6–7.

### iii.    Purchase Option

The parties agree that Rivera-Molina communicated to Casa La Roca before December 31, 2020, that he wanted to exercise his right to purchase La Roca II and La Roca III. Docket No. 287, pg. 14 (¶ 101); Docket No. 319, pg. 8 (¶ 101). The parties also agree that they did not finalize the sale before

that date. Docket No. 287, pg. 10 (¶ 68).[5] Casa La Roca argues
that the Termination Agreement required Rivera-Molina to
close on those properties before the Termination Date. Docket
No. 286, pgs. 36–37.

Under Puerto Rico law, an option contract is
essentially a precontract that contemplates a later contract.
*Rosa-Valentín v. Vásquez-Lozada*, 103 D.P.R. 796, 3 P.R. Offic.
Trans. 1115, 1129 (P.R. 1975). Its elements are: (1) granting by
one party to another the power to decide whether to execute
the principal contract; (2) this power is exclusive and (3) has a
set term; and (4) there is no condition other than the
optionee's judgment. *Id.*; *see also Mayagüez Hilton Corp. v.
Betancourt*, 156 D.P.R. 234, 246 (P.R. 2002).[6] As to the fourth
element, an option is exercised "by the mere declaration of the

_____

5. Under our local rules, a fact that is supported by a record citation is
deemed admitted if it is not properly controverted. D.P.R. Civ. R. 56(e). A
fact is properly controverted if the opposing party "support[s] [the] denial
or qualification by a record citation." D.P.R. Civ. R. 56(b). Casa La Roca
has properly supported this assertion, but Rivera-Molina has not properly
controverted it. Thus, we deem this fact admitted.

6. A certified translation is available at Docket No. 20-1 in Villa v. Pérez-
Cacho, 20-cv-1586 (PAD).

holder." *Mayagüez Hilton Corp.*, 156 D.P.R. at 246. So one exercises his option by declaring his intent to enter into the contract that the option contemplates.

A purchase option is a precontract "the purpose of which" is "the execution of a principal contract (the sale)." *Rosa-Valentín*, 3 P.R. Offic. Trans. at 1134. The purchase option here gives Rivera-Molina "the exclusive option right to buy . . . La Roca II and La Roca III until the Termination Date" and says that "this right expires after the [Termination Date]." Docket No. 287-1, pg. 4–5. Casa La Roca construes that language as requiring Rivera-Molina to close on the properties before the Termination Date, but that is not the correct reading. The clause confers on Rivera-Molina the exclusive right to choose whether he wants to buy La Roca II and III and requires him to exercise that right before the Termination Date. In short, the Termination Date is the time limit within which Rivera-Molina must declare his decision to exercise his option to purchase the properties—not the time within which he must finalize the purchase agreement that the option contemplates. Because it is undisputed that Rivera-

Molina declared that he wanted to buy La Roca II and III before the Termination Date, he exercised his option to purchase those properties before the option expired. Thus, Casa La Roca is not entitled to summary judgment on the ground that this clause required Rivera-Molina to close on those properties before the Termination Date.

### C. Excusing Breach

#### i. *Illicit Clause*

Casa La Roca claims that even if it breached the option clause, Rivera-Molina's claim stemming from that breach should be dismissed because the option clause violates Puerto Rico law. Docket No. 286, pg. 39. A contractual provision that contravenes Puerto Rico law is null and void. *See Colegio de Ingenieros y Agrimensores v. Autoridad de Acueductos y Alcantarillados*, 131 D.P.R. 735, 767 (P.R. 1992). Under Puerto Rico law, it is illegal to serve as a broker in a real estate transaction without a license. P.R. LAWS ANN. tit. 20, § 3059. A broker, as relevant here, is someone who agrees to perform a real estate transaction for another in exchange for

compensation. *Id.* And a real estate transaction is a real estate sales contract, option to buy or sell, or purchase-sale option in which a broker serves as an intermediary. § 3025(t).

The parties agree that Rivera-Molina is not a licensed broker and that he knew that when he signed the Termination Agreement. Docket No. 287, pg. 16 (¶¶ 108–09); Docket No. 316, pg. 9 (¶¶ 108–09). Yet the option clause gives him the right to buy *or sell* La Roca II and III for $2 million per property and a sales commission of 5% and makes clear that Casa La Roca will not be expected to pay any additional commission to any other broker. Docket No. 287-1, pgs. 4–5. If he served as a paid intermediary between Casa La Roca and the buyer, which the clause clearly contemplates, he would be behaving as an unlicensed broker, in violation of Puerto Rico law.

The Termination Agreement contains a severability clause that reads:

> [If] any provision of this Agreement shall, for any reason, be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision hereof, and the Parties shall negotiate

> in good faith to modify this Agreement to
> preserve (to the extent possible) their original
> intent.

*Id.* at 6. Casa La Roca says that the severability clause requires us to declare the entire purchase option null and void. Docket No. 286, pg. 39. Rivera-Molina points out that this would "throw the baby out with the bathwater" and asks that we nullify his sales commission instead. Docket No. 299, pg. 39. Casa La Roca does not respond to Rivera-Molina's request that we nullify only his sales commission.

The only problem with the option clause is that it gives Rivera-Molina a sales commission if he sells the La Roca properties, which turns him into an unlicensed broker. Under the parties' severability clause, they agree that if one provision is invalid in any respect, none of the others will be affected. Because the only invalid language is the part of the option clause that gives Rivera-Molina a sales commission if he serves as an intermediary in a sale of the properties, and that language is not integral to any other part of the clause, the rest of the clause is valid. Because Rivera-Molina exercised

his option to buy the properties, not sell them, that the sales
commission is invalid does not excuse Casa La Roca's alleged
breach in refusing to sell the properties to him.

### ii.   *Exceptio Non Adimpleti Contractus*

Casa La Roca argues that it is entitled to resolve[7] the
Termination Agreement and cannot be liable for any breach
because Rivera-Molina has failed to perform his essential
obligations under that Agreement. Docket No. 286, pg. 40.
Under Puerto Rico law, it is an implied term in contracts with
mutual obligations that the aggrieved party has the right to
resolve the obligations if the other party fails to fulfill its
obligations. P.R. LAWS ANN. tit. 31, § 3052. The aggrieved
party "may choose between exacting the fulfilment of the

---

7. Casa La Roca calls this remedy rescission. Rivera-Molina argues that
rescission is the wrong word—resolution, he says, is the right word.
Docket No. 286, pg. 40. Under Puerto Rico law, only certain contracts are
subject to rescission, P.R. LAWS ANN. tit. 31, §§ 3491–3492, and the
Termination Agreement does not appear to be one of them. To be sure, in
P.R. LAWS ANN. tit. 31, § 3052, at least in the English translations on
Westlaw and Lexis, the remedy Casa La Roca seeks is called rescission.
But based on our caselaw review, resolution (*resolución*, in Spanish)
appears to be right word.

obligation or its [resolution], with indemnity for damages and payment of interest in either case." *Id.* But resolution is not available unless the unfulfilled obligation is reciprocal in nature. *Dopp v. Pritzker*, 38 F.3d 1239, 1243 (1st Cir. 1994). "Reciprocity inheres when 'there are obligations and correlative obligations so interdependent between themselves that one is the consequence of the other, and the performance of said obligation by a contracting party constitutes the motive of the contract for the other party, and vice versa.'" *Id.* (quoting *Ponce v. Vidal*, 65 P.R.R. 346, 351 (1945)). The unmet obligation, in other words, "must be an essential obligation or fulfillment of the obligation must constitute the motive that induced the other party to enter into the contract." *Id.* (quoting *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989) (revised official translation)). Resolution is "a remedy of last resort, reserved for situations in which a party's breach dissipates the very essence of a contract." *Id.*

Casa La Roca argues that it is entitled to resolve the Termination Agreement because Rivera-Molina failed to maintain the properties and handle the taxes and utilities.

Docket No. 286, pgs. 40–41; Docket No. 312, pgs. 14–15. Rivera-Molina contends that he complied with his obligations under the Termination Agreement and, even if he did not, maintaining the properties and handling the taxes and utilities are accessory obligations, not essential ones. Therefore, he argues, resolution is not an available remedy. Docket No. 299, pgs. 42–43; Docket No. 318, pgs. 22–23.

We turn now to whether Rivera-Molina's obligations to maintain the properties and handle the taxes and utilities were "the contract's *raison d'etre*." *Dopp*, 38 F.3d at 1246. Casa La Roca says that they were and points to two things in support. First, it argues that the Termination Agreement speaks for itself in that it gives Rivera-Molina 100% of the rental profits in exchange for maintaining the properties and working out the tax and utility issues. Second, it notes that Rivera-Molina sent Casa La Roca an email before they signed the Termination Agreement highlighting the most salient points, including that he would be responsible for paying the utilities, taxes, property insurance, and maintaining the properties. Docket No. 312, pgs. 1–2. Rivera-Molina tells a

different story. He says (through a declaration under penalty of perjury) that the parties entered into the Termination Agreement to settle a dispute about money Casa La Roca owed him in connection to his business renting out the properties. Docket No. 318-1. And he describes the purpose of the Agreement as compensating him for the money that Casa La Roca owed him by allowing him to pocket all the rental profits during the time the Agreement covered and giving him the option to buy the properties at the price in the Agreement. *Id.* Subsidiary to that purpose, he says, he agreed to straighten out and cover the utilities and taxes and maintain the properties. *Id.*; *see also* Docket No. 318, pgs. 22–23. Casa La Roca responds that it would not have entered into the Termination Agreement had Rivera-Molina not agreed to fulfill the obligations that he allegedly breached. Docket No. 312-2 (unsworn declaration). It makes no argument as to the role that the parties' financial disputes played in its decisional calculus to enter into the Agreement.

We find that Rivera-Molina maintaining the properties and handling the taxes and utilities are not the essence of the

Termination Agreement and therefore that Casa La Roca is not entitled to resolve the Agreement on the ground that he failed to comply with those obligations. And we find that the purpose of the Agreement was to settle the parties' disputes about who owed what to whom and formally end their partnership. First, the parties had an oral partnership for years where part of their arrangement was that Rivera-Molina maintained the properties in exchange for 50% of the profits. It seems odd that the motivating factor for Casa La Roca entering into the Termination Agreement would have been him maintaining the properties and handling the taxes and utilities in exchange for 100% of the rental profits, given that he had maintained the properties through their oral partnership for only 50% of the rental profits. Second, in the Termination Agreement, Casa La Roca waived the payment of more than $300,000 that it claimed Rivera-Molina owed it, and Rivera-Molina waived the payment of more than $500,000 that it claimed Casa La Roca owed him. There is also a broadly worded mutual release of all claims that the parties have against each other arising out of their business

partnership. Docket No. 287-1, pg. 2. Yet Casa La Roca makes no argument about the role that these significant waivers and releases played in its decisional calculus to enter into the Termination Agreement. In short, Casa La Roca did not enter into the Termination Agreement so that Rivera-Molina would maintain the properties and handle the taxes and utilities during the timeframe set forth in the Agreement—it entered into it to resolve its outstanding financial disputes with Rivera-Molina, secure a mutual release of claims, and part ways with him. We find that the obligations that it claims that Rivera-Molina has breached are accessory, not essential. Thus, even if he breached them, resolution is not an available remedy. But damages, of course, are an available remedy.

## IV.    CONCLUSION

In sum, for the reasons above, the Court denies Casa La Roca's motion for summary judgment (Docket No. 286).

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 21st day of March 2023.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE